**SHELL OIL COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 80–2134.

United States Court of Appeals, Fifth Circuit.*
Unit A

Dec. 17, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Thomas G. Johnson, Houston, Tex., for Shell Oil Co.

A. Karen Hill, Atty., F.E.R.C., Washington, D. C., for respondent.

Before CHARLES CLARK, GARZA, and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

This case arises under section 19(b) of the Natural Gas Act, 15 U.S.C.A. § 717r b, and involves the question of what interest rate should be applied to a refund of money owed by pipeline purchasers to a natural gas producer, Shell Oil Company. In ordering the refund in question, the Federal Energy Regulatory Commission (FERC) directed that the producer (Shell) was to receive a refund at a rate of seven percent per annum simple interest. Shell maintains this order was an abuse of discretion on the part of FERC and constitutes arbitrary and capricious action, since the imposed seven percent interest rate varies from the interest rates generally imposed by FERC for refunds paid by producers and pipeline companies for the time period that funds are withheld from the rightful owners.

This Court holds that FERC abused its discretion and acted arbitrarily and capriciously when it authorized the payment of the interest on refunds owed to Shell by its pipeline purchasers at the rate of seven percent per annum simple interest, rather than the rate of nine percent per annum simple interest prior to October 1, 1979, and the average prime rate thereafter, compounded quarterly. As a result, FERC's order is reversed.

I. *Facts*

In 1971, the Federal Power Commission (FPC) issued Opinion No. 598, adopting a settlement agreement that established the just and reasonable rates producers could charge for natural gas in the Southern Louisiana Area. 46 F.P.C. 861 (1971), *affirmed, Placid Oil Company v. FPC*, 483 F.2d 880 (5th Cir. 1978), *affirmed sub nom. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974). As a result of this opinion, it became apparent in many cases that the established rates were much lower than those that producers such as petitioner Shell Oil Company had been charging since 1965. Producers owed millions of dollars in refunds to the consumers of natural gas. Therefore, Opinion No. 598 established a procedure that would allow a producer to "work off" part of its debt by dedicating new gas reserves to the interstate market. A producer was allowed to credit against its refund obligation one cent per Mcf of gas reserves dedicated to and sold in the interstate market from August of 1971 until October of 1977. If a producer had not completely worked off its refund obligation by October 1, 1977, it was required to make a cash refund of the monies plus seven percent simple interest effective from August 1, 1971.[1]

The refund credit procedure established in Opinion No. 598 was modified in 1974. The modification was a response to the FPC's pronouncing national rates for gas reserves dedicated to interstate commerce on or after January 1, 1973. In Opinion No.

[1] It is important to note that Opinion No. 598 was the adoption of a settlement agreement. Since producers made more money than they were entitled to receive, they were given the opportunity to work off their debt or wait until 1977 and pay back the monies at an established interest rate. The interest rate was locked in because it was part of a settlement agreement. The producer, therefore, could make an informed decision about whether to try to work off its debt or to pay out the money.

699, 51 F.P.C. 2212, *affirmed sub nom. Shell Oil Co. v. FPC*, 520 F.2d 1061 (5th Cir. 1975), *cert. denied sub nom. California Co. v. FPC*, 426 U.S. 941, 96 S.Ct. 2660, 49 L.Ed.2d 394 (1976), the FPC required producers to waive the refund credit in order to receive the new national rate for the natural gas produced. Subsequently, the FPC required producers to make a similar election in Opinion No. 749, 54 F.P.C. 3090 (1975). This opinion established national rates for flowing gas, which was gas that had been dedicated to interstate commerce prior to January 1, 1973. Opinion No. 749 required producers to either continue earning refund credits by selling flowing gas at the lower area rate or to forego refund credits and begin charging the new, higher nationwide rates for the gas. Shell chose to charge the new, higher rates.

In October of 1977, producers were ordered to satisfy their outstanding refund obligations created by Opinion No. 598 at the seven percent interest rate. At this time, Shell paid off the remaining balance of the excess charges together with the accumulated interest. However, in April of 1978, this Court set aside that portion of the Commission opinion requiring a waiver of refund credits for sales of flowing gas. *Tenneco Oil Co. v. FERC*, 571 F.2d 834 (5th Cir. 1978). This Court held the opinion improperly denied use of the work off credit refund procedure. The basis of the Court's holding was that since the flowing gas rate did not include a component to encourage dedication, FERC could not require producers to give up the bargained for refund credits in order to earn the established just and reasonable rate for flowing gas. As a result of the *Tenneco* decision, it became evident Shell had refunded more than it actually owed when it made its refund payments in October of 1977.

Shell, in May of 1978, petitioned FERC to defer the pipeline purchasers' distribution of the refund payments to natural gas consumers. Shell alleged that since this Court's *Tenneco* decision established Shell was entitled to some of the money that would be given to consumers, the flow through of the funds should be delayed until the amount Shell was entitled to receive as a refund could be determined and filed with FERC. FERC denied Shell's petition on June 27, 1978, stating that although Shell may have a proprietary interest in the money, as a matter of equity, the pipeline purchasers should begin the process of distributing the monies to natural gas consumers. FERC indicated Shell could avoid being disadvantaged by filing a request for a producer surcharge in order to recover the amounts finally determined to be repayable pursuant to the *Tenneco* decision.

Shell sought rehearing of its petition. It argued it would be unduly disadvantaged because of the impracticality of recouping its money through the mechanism of a producer surcharge. FERC retracted the concept of a producer surcharge and stated that a more appropriate method of recouping the overpaid refunds would be through the use of a pipeline surcharge. In other words, the pipeline purchasers would pay Shell the monies owed to it, and the pipeline purchasers then would be allowed to reimburse themselves by adding a surcharge to their customer rates.

In late 1979, Shell filed a claim for recoupment of refunds. FERC, on June 25, 1980, ordered the pipeline purchasers to repay excess refund amounts back to producers with simple interest at seven percent per annum from the date of receipt of the excess amounts to the date of repayment. FERC explained the reason for imposing a seven percent interest rate by stating,

> Inasmuch as the producers paid simple interest at the rate of 7% per annum from date of receipt of their excess amounts to the date of repayment, we think it appropriate to require that the pipelines companies [sic] pay the same interest on the refund money, including both principal and interest, they must disburse.

Record, Joint Appendix, at 533.

Shell filed a petition for rehearing. Its major claim was it was entitled to an interest rate of nine percent per annum simple

interest from the date it paid the excess amounts until October 1, 1979, and the average prime rate ·thereafter, compounded quarterly. Shell maintained this would be in conformance with FERC's generally applicable regulations that were promulgated in FPC Order No. 513 and FERC Order No. 47. FERC denied rehearing, stating the seven percent rate imposed was the one that had been approved in Opinion No. 598. As a result, FERC held that the subsequent rulings in FPC Order No. 513 and FERC Order No. 47 "have no applicability to refunds made by producers in accordance with Opinion No. 598." FERC acknowledged that "[t]he seven percent interest rate provided in Opinion No. 598 relates to refunds paid by producers to pipeline purchasers and does not expressly apply to repayments by pipeline purchasers of excess refunds made by producers." However, FERC reasoned that since the money Shell was entitled to receive was a portion of the same monies Shell had held, it was appropriate for the same interest rate to apply.

This appeal followed.

## II. *Proper Repayment*

This Court's determination of what interest rate is proper in this case involves a two-step process. First, it must be determined what Commission order is applicable. This Court determines that the interest rates prescribed in FPC Order No. 513, together with FERC Order No. 47, are the interest rates generally utilized by FERC. Second, it must be determined whether there is any valid exception that would allow FERC to refuse to apply the regulations generally utilized. This Court determines there is no valid exception that would allow such a refusal.

### A. *Applicable Regulations*

■ This case essentially raises the need to resolve the conflict between two opinions or orders of the Commission. On the one hand, FERC claims that Opinion No. 598,

which sets the interest rate for refunds from producers to pipeline purchasers at seven percent per annum simple interest, is the regulation that should be recognized as dictating the appropriate interest rate in the case *sub judice*. On the other hand, Shell claims that Order No. 513, which was issued in 1974, establishes the appropriate interest rate. Order No. 513—together with Order No. 47, issued in 1975—sets the interest rate at nine percent per annum simple interest on amounts belonging to Shell and held by pipeline purchasers prior to October 1, 1979, and the average prime rate thereafter, compounded quarterly. This Court recently approved this method of computing interest in the case of *United Gas Pipe Line Co. v. FERC*, 657 F.2d 790 (5th Cir. 1981).[2]

Initially, the Court is aided in its determination of what regulations are applicable in the case *sub judice* as a result of FERC's admission that Opinion No. 598 is not expressly applicable. FERC admits that Opinion No. 598 expressly applies *only* to refund payments made by producers to purchaser pipelines as a result of overpayment arising out of the *Tenneco* decision. Since Opinion No. 598 is not expressly applicable to refunds made by pipeline purchasers to producers, the applicable regulations are those that are utilized generally.

■ This is true because an agency must conform to its existing regulations absent a clear and acceptable explanation for its departure. *Mitchell Energy Corp. v. FERC*, 580 F.2d 763, 765 (5th Cir. 1978) *citing Secretary of Agriculture v. United States*, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); *Ashland Exploration, Inc. v. FERC*, 631 F.2d 817 (D.C.Cir.1980). FERC's general policy regarding interest rates is that interest rates on refunds are to be calculated as articulated in Order Nos. 513 and 47. The question before the Court is whether FERC has articulated valid reasons for applying different interest rates in the case *sub judice*.

2. For the sake of clarity, many references are made only to "the nine percent interest rate." In all instances, such a statement refers to the regulations and interest rates approved in *United Gas Pipeline Co. v. FERC*.

## B. FERC's Refusal to Apply Applicable Regulations

FERC gives basically two reasons for failing to follow its general regulations. The first reason is simply that since the granting of refunds is an equitable action, interest charged on refunds is also a matter of equity and within FERC's equitable discretion.

 This Court recognizes that the allowance of interest on refunds may be based on the equitable principle that a person should not be unjustly enriched by having the use of someone else's funds. *See United Gas Improvement Co. v. Callery Properties, Inc.*, 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965). Nevertheless, FERC cannot abuse its discretion. It may not choose arbitrarily "to grant to one person the right to do that which it denies to another similarly situated. There may not be a rule for Monday, and another for Tuesday, a rule for general application, but denied outright in a specific case." *NLRB v. Sunnyland Packing Co.*, 557 F.2d 1157, 1160 (5th Cir. 1977) *citing Mary Carter Paint Co. v. Fed. Trade Commission*, 333 F.2d 654, 660 (5th Cir. 1964), *reversed on other grounds*, 382 U.S. 46, 86 S.Ct. 219, 15 L.Ed.2d 128 (1965). In certain instances, no doubt, FERC may exercise its equitable discretion and stray from the use of its general regulations. In order to do so, however, FERC must articulate valid reasons for the departure. The exercise of such discretion without expressing such valid reasons may be considered arbitrary and capricious. FERC's exercising its equitable discretion for the sake of exercise or simply because it possesses equitable discretion is an insufficient justification for departing from the application of its general regulations.

 This leads to examination of FERC's second reason for its actions. FERC maintains that since the money Shell seeks in the form of a refund from its pipeline purchasers is the "same monies" originally paid by Shell to the pipeline purchasers pursuant to Opinion No. 598, the same interest rate Shell paid when refunding the pipeline purchasers should be charged when the pipeline purchasers repay Shell. This "same monies" theory is not an acceptable justification for a departure from FERC's general regulations.

Initially, this money cannot be accurately characterized as the "same monies" the producers paid to the pipeline purchasers. FERC ordered, in the face of Shell's motion to prevent such action, that the money paid by Shell to the pipeline purchasers be passed on directly to consumers. This payment from pipeline purchasers to consumers was to occur before the pipeline purchasers repaid Shell. In other words, repayments to producers such as Shell were to come only *after* the original monies "flowed through" to consumers. In addition, the money the pipeline purchasers were ordered to repay to Shell was to be paid prior to the pipeline purchasers reimbursing themselves out of surcharges levied against consumers. Any reimbursement to the pipeline purchasers was to come *after* the pipeline purchasers had repaid Shell. As a result, the money the pipeline purchasers were required to repay Shell was money from the pipeline purchasers' cash accounts. It is impossible to trace the refunds paid by Shell to the money the pipeline purchasers are to repay. As a result, FERC's attempted justification for departing from application of its general regulations is not well reasoned and is an unsatisfactory explanation for such a departure.

Additionally, FERC's "same monies" reasoning is flawed since there is no explanation for its discriminatory application of the theory. The pipeline purchasers were to pass on to natural gas consumers the refunds made by producers pursuant to Opinion No. 598. If the pipeline purchasers delayed in passing on this money, they would be required to pay consumers an additional nine percent interest on the money that they withheld, since this is the interest rate generally applied under Order Nos. 513 and 47. The point is if this Court assumes FERC is correct—that these are the same monies the producers paid to the pipelines—then FERC is taking an inconsistent position. It will require the pipeline

purchasers to pay interest at the rate of nine percent when they pass that money to consumers, but it does not require them to pay a nine percent interest rate when it gives the money back to the producers. This selective use of the nine percent interest requirement indicates FERC is discriminatorily applying its "same monies" theory as the justification for not following its general regulations. Such action is an inappropriate justification for departure from established standards.

There is an additional consideration in FERC's application of its "same monies" theory. Pursuant to FERC's order, once the pipeline purchasers pay the producers, they may thereafter collect money from the consumers in order to reimburse themselves. If there is any delay between the time they repay the money to the producers and the time they recoup that money from their consumers, the pipeline purchasers may charge an interest rate provided for in the general regulations. These collections from consumers will be, indeed, the "same monies" the pipeline purchasers are using to reimburse themselves for repayment to the producers. However, consumers are not permitted to benefit from the seven percent interest rate established by Opinion No. 598. If the "same monies" theory were a valid justification for departing from application of FERC's general regulations, then allowing pipeline purchasers to claim the benefit of the seven percent interest rate established by Opinion No. 598 would justify allowing natural gas consumers to benefit from the seven percent rate when the pipeline purchasers reimburse themselves. FERC does not allow natural gas consumers to enjoy the seven percent interest rate. This application of an exception to FERC's general rule is unacceptable.

Finally, Order Nos. 513 and 47, which changed the interest rate from seven percent per annum to nine percent per annum, were effective as against all refunds made after the orders were entered. As a result, the nine percent interest rate was made applicable if the refund payment was to be made after the effective dates of Order Nos. 513 and 47. Of course, the pipeline purchasers' refunds to Shell necessarily will occur after Order Nos. 513 and 47 became effective.

In summary, FERC is bound to apply its generally applicable regulations—FPC Order No. 513 and FERC Order No. 47—in all cases unless it provides valid articulable reasons for a departure. In the case *sub judice*, FERC has failed to provide an appropriate reason for a departure from the general regulations. As a result, this Court holds that pipeline purchasers must make refund at the rate of nine percent per annum simple interest from the date Shell made these payments to purchaser pipelines through October 1, 1979, and the average prime rate thereafter, compounded quarterly.

FERC's order is

REVERSED.